## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1) AARON LEMEAL COOPER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CASE NO.:  CIV-22-1027-D |
| | ) | |
| (1) OKLAHOMA COUNTY CRIMINAL | ) | |
| JUSTICE AUTHORITY, | ) | |
| (2) BOARD OF COUNTY COMMISSIONERS | ) | |
| FOR OKLAHOMA COUNTY, | ) | Attorney Lien Claimed |
| (3) MICHAEL THOMAS HUGHES, | ) | |
| | ) | Jury Trial Demanded |
| Defendants. | ) | |

## COMPLAINT

**COMES NOW**, the Plaintiff Aaron Lemeal Cooper, and for his Complaint against the above-named Defendants, states and alleges as follows:

## PARTIES

1.     Plaintiff Aaron Lemeal Cooper ("Plaintiff" or "Mr. Cooper") is an individual and a citizen of the State of Oklahoma.

2.     Defendant Oklahoma County Criminal Justice Authority ("OCCJA" or "Jail Trust") is a public trust created for the furtherance of purported public functions pursuant to 60 Okla. Stat. § 176, *et seq.* OCCJA was created by a certain "Trust Indenture."  Under the Trust Indenture, OCCJA is to "assist" Oklahoma County in its stated objective of operating the Oklahoma County "Jail Facilities", which includes the Oklahoma County Detention Center ("Oklahoma County Jail" or "Jail"). Under the Trust Indenture, OCCJA was delegated the responsibility of developing policies and procedures to address the

1

administration of the Jail. However, the Trust Indenture specifically provides that the Oklahoma County Sheriff was to continue operating the Jail until such time as the OCCJA and Oklahoma County had entered into a lease agreement and/or funding agreement(s) that specifically provided for the OCCJA to commence responsibility for management and operation of the Jail. OCCJA did not take over responsibility for management and operation of the Jail until June 1, 2020. However, since June 1, 2020, OCCJA has remained the County entity with primary responsibility for the management and operation of the Jail. The Oklahoma County Sheriff and a member of the Oklahoma County Board of County Commissioners are permanent members / trustees of the OCCJA. OCCJA is sued as a successor County entity under Plaintiff's municipal liability theory.

3.     Defendant Board of County Commissioners for Oklahoma County ("Board", "BOCC" or "Oklahoma County") is the legislative entity with non-delegable statutory responsible for providing a jail facility for Oklahoma County, Oklahoma that is adequate for the safe-keeping of inmates at the Jail. *See* 57 O.S. § 41. As a matter of Oklahoma law, BOCC exercises the powers of the county. *See* 19 Okla. Stat. § 3. A suit brought against BOCC is the way Oklahoma law contemplates suing the county. *See* 19 Okla. Stat. § 4. BOCC is charged with ensuring that the Jail has adequate funding and resources to provide constitutionally sufficient conditions of confinement.

4.     Defendant Michael Thomas Hughes ("Officer Hughes" or "Hughes") is a citizen of Oklahoma. Officer Hughes was, at all times relevant hereto, acting under color of state law as employee and/or agent of Oklahoma County/OCCJA.

**<u>JURISDICTION AND VENUE</u>**

5.      The jurisdiction of this Court is invoked pursuant to 28 U.S.C § 1343 to secure protection of and to redress deprivations of rights secured by the Eighth and/or Fourteenth Amendment(s) to the United States Constitution as enforced by 42 U.S.C. § 1983, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under the color of law.

6.      This Court also has original jurisdiction under 28 U.S.C. § 1331 to resolve a controversy arising under the Constitution and laws of the United States, particularly the Eighth and/or Fourteenth Amendment(s) to the United States Constitution and 42 U.S.C. § 1983.

7.      The acts complained of herein occurred in Oklahoma County, Oklahoma. Jurisdiction and venue are thus proper under 28 U.S.C. §§ 116(a) and 1391(b).

## FACTUAL BACKGROUND

■ **Facts Specific to Mr. Cooper**

8.      Paragraphs 1-7 are incorporated herein.

9.      On December 3, 2020[1], Mr. Cooper was a pretrial detainee at the Oklahoma County Jail.

10.     Mr. Cooper was just 19-years-old at the time.

11.     Mr. Cooper had an association with the "Panic Zone Crips" street gang through his brother.

---

[1]      As December 3, 2022 was a Saturday, the statute of limitations for Plaintiff to file his Complaint is December 5, 2022.

12.     Mr. Cooper's familial association with the Panic Zone Crips was known within the Jail. Importantly, Officer Hughes was well-aware of Mr. Cooper's familial association with the Panic Zone Crips.

13.     As Officer Hughes also knew, members of the rival Bloods gang housed at the Jail had a vendetta against Mr. Cooper's brother and wanted him dead.

14.     Despite the known, obvious, and severe risks to Mr. Cooper's health and safety, Officer Hughes moved Mr. Cooper from his pod to the "David pod", which Officer Hughes knew to house multiple members of the rival Bloods gang intent on harming Mr. Cooper.

15.     As a result of Officer Hughes' failure to protect him from harm in deliberate indifference to the consequences, in the early morning of December 3, 2020, Mr. Cooper was severely beaten by eleven (11) other inmates, all believed to be members of the Bloods.

16.     The inmates struck Mr. Cooper several times from behind, knocked out two of his teeth and inflicted a gash above his left eye that required seven stitches. Two of the inmates pulled a defenseless Cooper into a cell and held him against his will during the assault.

17.     The group of inmates initially struck Cooper in the back with a broom handle, and struck him multiple times as he was lying defenseless on the ground.

18.     Mr. Cooper's other injuries included bruising to his left shoulder and above his right eye, swelling on his right ear and bruising from shoe tread on his neck.

19.     After the assault of Mr. Cooper, Hughes attempted to clean up Cooper's blood and did nothing to assist Mr. Cooper. Indeed, with deliberate indifference, Hughes failed to notify medical staff about Copper's severe injuries.

20.     Cooper did not receive any medical attention for around one hour.

21.     The Eighth Amendment and Fourteenth Amendment alike require that inmates and detainees be given reasonably adequate conditions of confinement. The right to be protected against violence committed by other inmates is part of the conditions of confinement requirement afforded by the United States Constitution.

22.     Any reasonable Jail employee knew or should have known those rights at the time of the complained of conduct as they were clearly established.

23.     Officer Hughes had actual knowledge, or it was obvious, that Mr. Cooper was at substantial risk of inmate-on-inmate assault were he placed in a pod housing members of the Bloods street gang.

24.     With deliberate indifference, Officer Hughes failed to protect Copper from harm, and disregarded the known, obvious and excessive risks of harm to Mr. Cooper.

25.     Officer Hughes was subsequently charged with one count of felony assault and battery with a dangerous weapon in relation to the assault on Mr. Cooper. Hughes pled no contest to an amended charge of "willful neglect of duty"

26.     As a direct proximate result of Officer Hughes' unlawful conduct, Mr. Cooper has suffered actual and severe physical injuries, physical pain and suffering and emotional and mental distress and damage.

- **County Policies and Customs**

27.     Paragraphs 1-26 are incorporated herein.

28.     There is an affirmative link between the aforementioned unconstitutional acts of Lieutenant Brewer and policies, practices and/or customs which Oklahoma County/OCCJA promulgated, created, implemented and/or possessed responsibility for.

29.      From its inception in 1991, the Jail has been systemically deficient. Overcrowding, under staffing, inadequate security and supervision, excessive use of force by staff and assaults have been constant.

30.      Following a lengthy investigation, in 2008, the U.S. Department of Justice issued a report on conditions of confinement at the Jail. The DOJ found woefully inadequate supervision and staffing at the Jail, a lack of basic medical and mental health care, overcrowding and a high rate of inmate assaults and deaths.

31.     A copy of this DOJ Report was sent to Defendant BOCC or Jail Trust, in their official capacity by sending it to John Whetsel, Oklahoma County Sheriff in 2008, as well as the Oklahoma County District Attorney and the United States Attorney for the Western District. As such, Defendants BOCC and Jail Trust were on notice and aware of the constitutional deficiencies addressed by the DOJ Report.

32.     Defendants BOCC and Jail Trust were aware prior to December 2020 that "the excessive number of detainees in close quarters contributes to issues such as **_increased violence among detainees_** and the grossly unsanitary condition of the cells." (DOJ Report, n. 4).

33.     The shortage of staff at the jail has contributed to a lack of control over the inmates at the Jail.

34.     Since 2008, the Department of Justice has been identifying deficiencies at the OCDC including: a. overcrowding; b. physical layout of the facility prohibiting adequate sight and sound supervision; c. an inordinately high risk of violence due to inability to properly supervise; and d. inadequate staffing numbers.

35.     In 2012, the DOJ cited that the OCDC was still short-staffed and that detainee-on-detainee violence was still excessive due to overcrowding.

36.     From at least 2008 to present, BOCC has failed to provide sufficient oversight and funding of Jail. Due to the documented dangers at the Jail, including DOJ's finding of inadequate supervision and staffing and a high rate of inmate assaults and deaths, in 2009, BOCC entered into a Memorandum of Understanding with the federal government. Under this Memorandum of Understanding, Oklahoma County was to adequately fund and staff the jail by 2014, or face court action from the federal government to force compliance.

37.     As of December 2020, Oklahoma County had plainly not complied with the requirements of Memorandum of Understanding with the Department of Justice.

38.     From at least 2008 to present, chronic shortage of detention officers and the facility's flawed design have made it impossible to adequately supervise the Jail.

39.     Documented insufficient staffing levels and the poor condition of the 30+-year-old jail building have contributed to high death rates, numerous assaults and a lack of basic rights for inmates at the Jail over the past decade.

40.     At the time of the incident involving Mr. Cooper, the Jail employed fewer detention officers to supervise inmates, and other officers, than it did in 2008.

41.    Due to the lack of adequate staffing, overcrowding and an attitude of indifference toward inmate safety, inmate-on-inmate assaults are commonplace at the Jail.

42.    Indeed, in December of 2020, Hughes released Joesiah Turner, another known Bloods member, who was in protective custody and not allowed to be outside his cell or have access to the general population.

43.    Hughes allowed Turner to enter the cell of Roy Lee Parkerson, where he stabbed Parkerson three times with a handmade shank.

44.    On February 7, 2021, an inmate called a central control employee at the Jail and told him a riot was breaking out on the second floor of the jail.

45.    "There's like four people using weapons," the inmate told Martin Jacobs, the employee. "I'm looking on the camera right now," Jacobs said. "I don't see that." Are you sure, the inmate asked. "Yep," the employee replied. "But I'll check with the rover, thank you."

46.    A review of surveillance video, shows Jacobs, "never picked up his radio to notify anyone," according to an internal investigative report of the altercation on 2B that night.

47.    An hour later, one of the inmates involved was beaten so badly he had to be hospitalized for two separate brain bleeds, according to the report.

48.    In January 2021, inmate Brad Lane was beaten to death by his cellmate. As the beating began, Lane screamed for help. Because of the woefully inadequate staffing at the Jail, Detention officers did not respond Lane's cries for help for almost an hour. By then, it was far too late.

49.     Lane repeatedly screamed "he's killing me, help me, he's killing me!" There was no one there to come to his aid. Another inmate called for help (for Lane) three times from the phone in his cell, but there was no answer.

50.     Four (4) other detention officers have been charged criminally for uses of excessive force on inmates who left their cells to shower or use the toilet without permission.

51.     Three former detention officers face misdemeanor charges of cruelty for placing detainees in a "standing stress position," a well-known "enhanced interrogation" or torture tactic, and forcing them to listen to the children's song "Baby Shark".[2] The detention officers sometimes used the song as a form of discipline for inmates who left their cells.

52.     Due to inadequate staffing, the "Baby Shark" victims were mostly left alone in their pods. One victim was singled out for punishment after he rigged the old, faulty lock in his cell so he could walk freely around the jail pod, shower and use a toilet with more privacy than the one in his shared living area.

53.     As summarized in the Probable Cause Affidavits, the blatantly unconstitutional conduct of the "Baby Shark" officers, "Miles, Butler and Hendershott", was open, obvious and repeated. Yet, no one from Oklahoma County stepped in to take remedial action.  This exemplifies a systemic and deep-seated failure to train and supervise,

---

[2]     Though these incidents occurred in 2019, when the Sheriff's Office operated the Jail, the Jail Trust is the successor entity for the purposes of municipal liability and BOCC has remained responsible for the Jail during all pertinent time periods.

with respect to the most basic aspects of correctional operations and constitutional

conditions of confinement. As stated in the Probable Cause Affidavits:

> Upon interviewing DO Miles, he confirmed that he and Butler systematically worked together and used the benches, bars and attorney booth as a means to discipline inmates and teach them a lesson because they felt that disciplinary action within the Detention Center was not working in correcting the behavior of the inmates. Butler also confirmed that he used the booth as a means of punishment. Miles further stated that the inmates often "pissed off" Butler which evidence suggests led to those inmates being taken out of their cells/pods and mistreated. The secure point on the wall was measured as being 3ft from the floor up the wall. At this height and with no chair to sit on, it would have been nearly impossible for most inmates to sit or kneel thus forcing them to stand.

> Statements made by inmates and staff also indicated that in addition to the corporal punishment given by Miles and Butler, they additionally worked together and played children's music on a loop to play repetitively aloud while the inmates were housed in the attorney visitation booth thus putting undue emotional stress on the inmates who were most likely already suffering from physical stressors. The playing of the music was said to be a joke between Miles and Butler as confirmed by Miles.

> Additional evidence showed that Detention Officers Miles and Butler worked under their direct supervisor, Lt. Hendershott, who ***failed to properly supervise and discipline*** them. Miles and Butler were the subject of numerous inmate complaints that detailed their ***history of mistreatment of inmates*** ranging from retaliation to mishandling of inmate mail. In addition, nearly ***20 hand written inmate complaints*** were received at one time regarding one or both Officers and directly forwarded to their supervisor, Lt. Hendershott. Evidence suggests that no investigation was conducted and subsequently no corrective action was taken by their direct supervisor, Lt. Hendershott. Evidence also showed that when Hendershott first learned of inmate mistreatment by Miles and Butler on 11-23-19, he took no immediate action to either aid the inmate victim or discipline the Officers. ***This appeared to have led to the Officers continuing to mistreat inmates where at least an additional six (6) inmates were physically victimized.***

54.     Another inmate, Charlton Chrisman, died in 2017 after he was shot at close

range more than a dozen times with pepper balls by detention officers at the Jail. His family

filed a federal civil rights lawsuit. BOCC recently approved a $1.1 million settlement of that lawsuit.

55.     The Jail Trust retained consultant David Parker to provide recommendations to remedy the continuing deficiencies at the Jail. Parker issued a report finding outdated training and policies and procedures, a staff consensus is that "every issue that transpires in the jail can be traced to staff shortages", and staff being trained to detect and/or intervene in inmate incidents appropriately.

56.     In May 2021, the National Institute of Corrections provided a report to the BOCC and Jail Trust finding: a. an incomplete staffing plan; b. that new hires receive limited training; c. "[c]lear and convincing present level of staffing was insufficient for a safe and secure jail"; d. it was "[i]mpossible to effectively manage inmate population when they are so short-staffed;" e. that officers were coming to work without proper training; and f. a lack of policies and procedures posted.

57.     In October of 2021, an inmate named Ta'Vion Murphy was subjected to an inmate-on-inmate assault when another detention officer, Dominique Thomas, allowed access an inmate access to Murphy for the purposes of permitting an assault of Murphy. Murphy was subsequently stabbed nearly 30 times.

58.     Defendants BOCC and Jail Trust's deliberate indifference to the DOJ's reports, and other clear evidence, warning that short staffing and overcrowding continue to lead to detainee-on-detainee violence violates all detainees' rights to be free from harm and threat, in violation of the United States Constitution.

59.     Numerous news and internet articles also made Defendants BOCC and Jail

Trust aware prior to December 2020 of the unreasonable conditions at the Jail, for example: "Over the past 15 years, the 13-story jail, in Oklahoma City has had many alleged problems, from unsanitary conditions to negligent car of inmates, poor medical care, and outright abuse of inmates. A clerical worker at the jail posted a YouTube video claiming inmates had been beaten right in front of her." (BUSINESS INSIDER, The stories coming out of this Oklahoma jail are horrifying, February 25, 2015).

60.    Oklahoma County/OCCJA plainly failed to adequately train and supervise its officers, in violation of policies and the Oklahoma Jail Standards, including Officer Hughes, with respect to, *inter alia*: protection of inmates, inmate-on-inmate assault, adequate medical care for injured inmates, cruel or inhumane corrections practices and constitutional requirements for the conditions of confinement.

61.    In finding constitutional liability at the county level, the Tenth Circuit, in *Tafoya v. Salazar*, 516 F.3d 912, 919 (10th Cir. 2008), pointed to evidence of an "undisciplined culture of 'anything-goes' among the detention officers [that] remained unaddressed and unmitigated by Sheriff Salazar, who continued to employ a hands-off approach to jail management." Here, as discussed throughout, the County's/Jail Trust's "management style" has been "hands-off" at best and describing the culture at the Jail as "undisciplined" and "anything goes" would be charitable.

62.    The County/BOCC/Jail Trust have had abundant opportunity to increase funding, supervision and training which would allow it to properly staff and address the systemic deficiencies that have plagued the Jail for well over 10 years. Its failure to do so has resulted in injury to multiple detainees, including Mr. Cooper. Its failure to take

reasonable measures to alleviate known and substantial risks to inmates like Mr. Cooper constitutes deliberate indifference at the municipal level.

## CAUSES OF ACTION

### VIOLATION OF THE EIGHTH AND/OR FOURTEETH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES (42 U.S.C. § 1983)

63.     Paragraphs 1-62 are incorporated herein by reference.

### A. Individual Liability and Underlying Violation of Constitutional Rights

- **Conditions of Confinement/Failure to Protect**

64.     At the time of the complained events, Mr. Cooper had a clearly established constitutional right under the adequate conditions of confinement.

65.     The right to be protected against violence committed by other inmates is part of the conditions of confinement requirement afforded by the Constitution.

66.     Any reasonable Jail employee knew or should have known those rights at the time of the complained of conduct as they were clearly established.

67.     Officer Hughes had actual knowledge, or it was obvious, that Mr. Cooper was at substantial risk of inmate-on-inmate assault were he placed in a pod housing members of the Bloods street gang.

68.     With deliberate indifference, Officer Hughes failed to protect Cooper from harm, and disregarded the known, obvious and excessive risks of harm to Mr. Cooper.

69.     Officer Hughes was subsequently charged with one count of felony assault and battery with a dangerous weapon in relation to the assault on Mr. Cooper. Hughes pled no contest to an amended charge of "willful neglect of duty"

70.     As a direct proximate result of Officer Hughes' unlawful conduct, Mr. Cooper has suffered actual and severe physical injuries, physical pain and suffering and emotional and mental distress and damage.

- **Denial of Adequate Medical Care**

71.     Detainees/Inmates like Mr. Cooper have a constitutional right to adequate medical care while they are detained/incarcerated.

72.     After being brutally assaulted, Mr. Cooper was in obvious need of emergent medical attention.

73.     By failing to timely obtain medical attention for Mr. Cooper, Officer Hughes was deliberately indifferent to a serious medical need.

74.     This deliberate indifference resulted was a direct and proximate cause of Mr. Cooper's prolonged pain and suffering, a worsening of his condition and mental anguish.

- **Municipal Liability**

75.     Paragraphs 1-74 are incorporated herein by reference.

76.     The aforementioned acts of excessive force by Officer Hughes are causally connected with customs, practices, and/or policies which Oklahoma County/OCCJA/BOCC promulgated, created, implemented and/or possessed responsibility for.

77. Those customs, practices, and/or policies are outlined in Paragraphs 27-62, *supra*.

78. Oklahoma County/OCCJA/BOCC knew, must have known or should have known that, by maintaining such customs, practices, and/or policies, detainees like Mr. Cooper were at substantial risk of harm. Nevertheless, Oklahoma County/OCCJA/BOCC failed to take reasonable measure to alleviate the risk of harm.

79. Oklahoma County/OCCJA/BOCC, through its failure to take reasonable remediable measures has been deliberately indifferent to citizens', including Plaintiff's, health and safety.

80. As a direct and proximate result of the aforementioned customs, policies, and/or practices, Plaintiff suffered injuries and damages as alleged herein.

## **PRAYER FOR RELIEF**

WHEREFORE, based on the foregoing, Plaintiff prays this Court grant her the relief sought, including but not limited to actual and compensatory in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from the date of filing suit, punitive damages for Officer Hughes' reckless disregard of his federally protected rights, the costs of bringing this action, a reasonable attorneys' fee, along with such other relief as is deemed just and equitable.

Respectfully submitted,

/s/Daniel E. Smolen
Daniel E. Smolen, OBA #19943
Robert M. Blakemore, OBA #18656
Bryon D. Helm, OBA #33003

SMOLEN & ROYTMAN
701    Cincinnati Ave.
Tulsa, Oklahoma 74119
P: (918) 585-2667
F: (918) 585-2669

***Attorneys for Plaintiff***